This is a case involving an indefinite suspension for alleged criminal misconduct. Because indefinite suspensions are not defined by statute, they are defined by case law. And because this case also involves the concept of nexus, which has a long judicial and administrative history, it is a case involving an indefinite suspension for alleged criminal misconduct. I would say the law relating to this case is less than clear. How did the agency find out about the indictment? I don't know, Your Honor. It seems that people could find it on the Internet. No, we could not find it on the Internet. I don't know how it was reported to the agency. I don't believe it's in the record. I may be mistaken, but I haven't seen it in the record. This case gives this Court really the first opportunity since the Engdahl case in 1990 to provide interpretation with respect to the concept of nexus in these indefinite suspension cases. There are remarkable parallels between the two cases and complete divergences in the analysis that should have been applied by the Merit Systems Protection Board. But before comparing this case with the Engdahl case, I want to go back to the Board's fundamental case, which it issued a couple years after its formation in 1981, which was the Merit v. Department of Justice case. And back in those early years of the Board, they issued a number of seminal decisions where they tried to analyze past law and provide future guidance for their judges and hopefully, I suppose, for this Court. And in the Merit case, the Board went to a lot of trouble to write an almost law-review-like article on the concept of the nexus going way back in the decisions of district courts and the Court of Claims and so forth. And they came up with a couple observations. One was that the tendency of the courts and the intent of the framers of the Civil Service Reform Act of 1978 was to have more rather than less scrutiny of nexus determinations. And secondly, although the nexus could be inferred in certain circumstances, there had to be some preconditions. First of all, conduct had to be egregious that was charged. And secondly, it had to be a reasonable linkage between the conduct that was being charged, particularly in off-duty cases, which is what nexus is all about, and the ability of the employee to perform his or her job or the ability of the agency to perform its mission. And the Board said, in part, in Merit, that in most cases, even if clearly criminal misconduct, establishment of a nexus need not and should not depend upon mere assertion or speculation. In all cases, it is the agency's burden to establish that the misconduct adversely affects the efficiency of the service. There was a concurrence in the Merit decision. To make sure that I understand the premise that's being presented to us, it is that we start with the premise that a felony indictment is never, without looking beyond it, adequate to support a suspension or a suspension without pay? Yes, that is the premise on which I am arguing the case. I believe it is the predicate of almost all the judicial decisions and the Merit Citizens Protection Board decisions, with the exception of a few, I would say two, MSPB decisions which just haven't been cleared. But there has never been a ruling that a felony indictment, no matter how egregious, is in and of itself sufficient to determine the nexus issue. Now, you can raise a presumption, you can raise a difference by reason of the severity of the conduct, but that's rebuttable. You're saying all the indictment is good for is the reasonable cause? Yes, sir, that is correct. The indictment itself would justify a shortened notice provision. It does meet that, it is good for purposes of that requirement. Absolutely, but that's not what this case is about, fortunately. That's other cases, Perez, for example. But did I understand you to say that an indictment might be sufficient for a presumption? For an inference or a presumption if there's a rational basis and if there is no contrary evidence offered by the appellant. The presumption is rebuttable, it's not an irrebuttable presumption. So the judge, the Merit Citizens Protection Board judge, in his very brief analysis of this case, said basically, I think there's enough for a presumption, but I'm not going to stand on that. I'm now going to get to the question of whether there was actual impairment of service efficiency based upon the testimony before me, before the judge. But it isn't as if there was no evidence. Just working on that premise, the employer did offer evidence. It had testimony. The question is the worthiness of the testimony. If you examine the testimony, by the way, before I go on to the testimony, I want to mention that there was a concurring opinion in the Merit case by the chairman, the then chairman of the Merit Citizens Protection Board, who said that the fundamental opinion of the board only spawned confusion. In fact, her words were, spawns further confusion in an area of law that is already borders on the COFKS. That was the chairman of the MSPB and the concurrence there. So this law is far from clear. Now, as for the facts of the case, what occurred here was that if you examine the proposal notice and the decision notice of the agencies, which are supposed to outline the factors that the agency relies upon in proposing any adverse action, including an indefinite suspension, you won't find any reference to anything other than the indictment. There's nothing else cited. So what occurred here was that the evidence of the agency and the factors it relied upon were developed during the Merit Citizens Protection Board hearing by the two principal agency witnesses who testified, Mr. Zone and Mr. Fitzmeyer. But we don't decide that. That's irrelevant to the decision before us. The fact that those things weren't on the indictment paper doesn't, I'm sorry, not the indictment paper, but that doesn't really make any difference to us on appeal, does it? Not on this case. It might in another case. That's the adequacy of the notice. But that's not the issue here. Okay. The issue here that Judge Newman asked me about was the sufficiency of the evidence, or at least the evidence itself. So if you go through the evidence provided by Mr. Zone and Mr. Fitzmeyer, Mr. Zone was the supervisor, Mr. Fitzmeyer was the deciding official in the case, you'll see that what they talk about, the only thing they talk about is the possibility there might have been publicity. There was no publicity in this case. There never was. There never has been. They talk about the possibility that some employer or employees might have found out about the background of the indictment and been concerned about working alongside my client. The possibility, not the reality. And that's where this case differs so much from the Engdahl case. In the Engdahl case, Engdahl was an electrician who worked at the Naval Air Development Center around Mill Grove, Pennsylvania. And that gentleman was indicted for child molestation. He was not only indicted, he was found guilty. He was placed on an indefinite suspension. And the factors that were involved there linking the off-duty conduct with the on-duty discipline were these. First, he had been arrested at the facility as some disruption. Second, there had been newspaper publicity naming both Mr. Engdahl and the agency. There were written statements by two co-workers of Engdahl who expressed fear, concern, or distress, my words, not theirs perhaps, about the possibility that Engdahl would then be working with them after this indictment. Most importantly, perhaps, Engdahl's duty as an electrician was that he went all over the Naval Air Development Center at Willow Grove dealing with electrical work, including routine visits to housing facilities where children resided. And then finally, Engdahl pled guilty. My client didn't plead guilty. He maintained his innocence throughout this. In this case, there's no involvement in the facility. No arrest, no publicity, no complaints by employees, no duties that in any reasonable imagination of any reasonable official could take my client into proximity with children. He worked at a cubicle. He was not an electrician. He was an IT, an information technology specialist. He didn't venture much beyond the advisor's little cubicle, and no children dwelled there. Is this entire case, in your view, about the indictment, or is there some component of it that's related to Mr. Reed's failure to come forward and tell his supervisor? Because that's some of the testimony. And I had trouble understanding or appreciating exactly whether or not that was a component of the agency's decision-making, his failure to come forward and trust and how that resulted in a lack of trust. You're absolutely correct, Judge. The problem with the agency's decision-making is that it did not explain in its proposal, as it should have under board law, the factors upon which it relied. That's what it's supposed to do, so it didn't do that. So it comes up with this notion of, well, the felon didn't tell us, and that causes us some concern about his integrity and whether we can trust him. Now, the problem here is that there is no reporting responsibility. You can look through the government-wide standards of conduct, 5 CFR 2635 or something like that. You won't find any reporting responsibility. Just out of curiosity, when you obtain a security clearance, I assume you're supposed to reveal if you've ever been charged with a criminal act, and an indictment would certainly count, right? There are reporting responsibilities with respect to security clearances, and if this agency, for failure to report, had suspended a security clearance, we wouldn't be here because that would have been incontestable. But they didn't do that. In fact, the judge, during the hearing, as people were starting to talk about what was reported, I thought that it was suspended, his security clearance. The security clearance was suspended, but that's not the reason they indefinitely suspended him. That's not part of this case. In fact, in the judge's discussion here, at page 76 of our appendix, counsel for the appellant at the time, Mr. LaRey of Philadelphia, starts getting involved in matters relating to the clearance and the question of reporting and things like that, because it was clear the agency was talking about this. So at page 76, Judge Garrity, the MSPB administrative judge, cuts him off, essentially, and says, Mr. LaRey, as you well know, the security clearance issue is an entirely separate proceeding in matter. I don't even know why we're discussing that. Mr. LaRey says, very well, Your Honor, no further questions. And life goes on. But the whole matter of the reporting with respect to the security clearance is a valid concern. If this case was based upon suspension or replication of a security clearance, and the agency could have done that, but that's not what they predicated the indefinite suspension on. The Cheney case, for example, decided in March or so of 2007, involved an indefinite suspension based upon a security clearance. Does Mr. Reed's success in this case depend on the notion that his coworkers were not going to discover anything about this indictment? Because that's certainly a factor that the previous cases have considered, and in this case it seems there was testimony about concern that this would be disruptive and that his coworkers may not have wanted to work with him. I mean, I agree with you that the testimony is far less firm than it was in Erdahl or previous cases. But the testimony does exist, and so does it hinge on the notion that in this case, unlike Erdahl and others, there was no public awareness, and so maybe it was not appropriate to conclude that his coworkers would even find out about it, that it was all too speculative? I'm very appreciative. Yes, that's the problem. It was entirely speculative. And in Saunders v. Postal Service, the 86th decision of this court, the court held that adverse action in an indefinite suspension, certainly an adverse action, cannot be supported by speculative or agency operations. The bottom line is this, clearly. But there was testimony that the legal team knew about it, and certainly the agency became aware of this. Well, of course. And now all of a sudden the supervisors are aware of it. I mean, what are the chances at that point it's not going to circulate more broadly? The chances are very high, because there's a thing called the Privacy Act, which makes it a high-level misdemeanor to disclose information to others who are not routinely using the information relating to federal personnel. It's a crime. I don't want to shock you, but there are good reasons not to disseminate this information, like you might go to prison, or you might get fired from your job for a violation of the Privacy Act. It's a crime for, I mean, I clearly don't know this, but it's a crime for one federal employee to tell another federal employee that they heard that someone has been indicted of a crime? No, it's not a crime to tell somebody what you've heard through the grapevine. It is a crime to disclose information from agency records that are tied to an employee to people with no routine user knowledge. That is a routine requirement to use the information. So it would not have been criminal for the supervisor to, if he happened to go out to lunch with another supervisor in another division, say, yeah, I've got this employee, it turns out he's been indicted of a crime. I'd fire that supervisor, and I think I'd have the reason to. You would, but it's not a crime. Yes, it is a crime. Now, I'm not a jury, and I'm not a judge, and I'm not an indicting official, but if that supervisor took that information, knowing that it was protected by the Privacy Act, and mentioned it to anybody else with no routine use to know, yes, I believe it would be criminal. I'd be very concerned about what that individual did. I certainly would. 5 U.S.C. 5528. It's very exquisite. How many people go to jail for violations of the Privacy Act, I don't know, but if somebody asks me whether they should do that, sir, tell them not to. Well, now, Mr. Breda, we're into rebuttal. Shall we hear from the other side, or is there anything else that you want to tell us at this stage? My most important comment, and I'm very interested in it, and I hope the government counsel will address this, is this. If these cases can ride on no more than the possibility of publicity, or the possibility that somebody might know and complain, then I believe what has been established is there's always the possibility of publicity. There's always the possibility that somebody might figure it out and complain. What we have is an irrebuttable presumption, and that's a huge change in the structure of the law. Thank you, Your Honor. Okay. Thank you. Mr. Lester. May it please the Court. Your Honor, there are two issues in this case. One is a theoretical issue, which is whether or not there can be a rebuttal presumption when a person is charged with child molestation, whether that is one of the types of activities that can form the basis of a rebuttable presumption of nexus. And the other issue here is the actual issue we have in the case, which is whether or not the Board correctly decided that based upon the evidence in this case, there was a nexus between the alleged conduct for which Mr. Reed was indicted and the efficiency of the service. As the Court is aware, although the Board here did identify the fact that this should be a rebuttable presumption, the Board went on and didn't rely on that. It, in fact, evaluated the testimony and all of the evidence, and based upon that testimony and evidence, found that without regard to a rebuttable presumption, that there was, in fact, a nexus between the indicted misconduct and the efficiency of the service. It is not, as Mr. Broide has alleged, simply that maybe if people found out, they would be upset about it. There were a litany of reasons that the deciding official elected to indefinitely suspend Mr. Reed during the proceedings before the criminal court. These included the loss of trust in Mr. Reed, who was in a security position. The effect, one reason was the likely disruptive nature that this would have on the coworkers if, in fact, they found out. And I will point out one important factor here, although unlike Indall, where people did know about it, the reason coworkers didn't know about it here was that Mr. Reed actively hid this indictment from the agency. The agency found out about this through other means, not from Mr. Reed. To understand your point, you say it doesn't matter whether anyone knew about it or not. If they had known, they would have been upset. Therefore, the appropriate response by the employer is the same as if people did know about it. What I am saying, Your Honor, is that the decision-maker here knows the base, knows the employees, knows what the workforce is like there. He's the one who made that determination that if they found out, it would cause disruption. That was my question. Let's accept, because there was testimony that, had I known, I would have been upset. But they didn't know. You're saying it doesn't matter that it was not known. Well, again, perhaps there could be instances where the decision-maker would decide, no, it's not going to make a difference here. No, that's not the question that I'm asking. They didn't know. You're saying it doesn't matter whether they knew or not. Because the decision-maker recognized that when and if the coworkers found out, there would be disruption on site. At which point, he might have then separated Mr. Reed, but he didn't. Well, he also, the indictment here was a matter of public record. It is not something, although Mr. Broder said it would be a violation of the Privacy Act for supervisors to talk about it, which perhaps it would be. It is certainly a matter of public record that Mr. Reed was indicted. It wasn't something that only the supervisor. Well, you're telling us about situations which didn't exist. And I'm trying to understand on this situation, accepting that an indictment is in the public record, this particular public of coworkers did not know about it. You're saying it doesn't matter. If they had known, they would have been upset. That's what the decision-maker recognized based upon his knowledge of the workforce. Precisely, and that's exactly my question to you. Where the distinctions are, you're saying there's no distinction. Well, there may be no distinction, depending upon the decision-maker's knowledge. You're saying there is no distinction whether anyone knew or not. In this case, the decision-maker made that judgment. But in addition, there is also the access to children issue, which the decision-maker also looked at, and that was that, in fact, this is a charge of child molestation. The security on base... Could it be that it's not? I'm still stuck on Judge Newman's point, so I don't want you to move on yet. Could it be that it's not? Whether or not people knew about it, they had the potential to know about it because it was a public document, and this is one of the situations where the agency feels like, and if we don't act, then later people will find out about it and we're going to be caught in this situation. They're going to say, hello, why didn't you do it? Well, exactly, and it is the agency's mission to protect both its workforce and to ensure that it continues to engender the public trust. But then wouldn't that justify the agency's ability to use any indictment or almost anything that people couldn't necessarily know about just because it happens to be somewhere? Just because it's possible to find something out doesn't mean that it's likely it will be found out, and I'm a little nervous about coming to the conclusion that you can rely on the notion that if it's found out, the people will be mad at us for not doing something. We would agree, Your Honor, that a hard and fast rule that every time there's an indictment, there's an automatic decision, an irrebuttable finding of nexus, we would agree that that would be inappropriate. What happened here, though, and what is appropriate, is the people who are making these decisions to look at the circumstances of the particular case before it, and that is what happened here. The individual looked at the circumstances here, knew his base, took the indictment, knew the circumstances, and made determinations based upon the relevant factors with regard to whether the indefinite suspension would meet the efficiency of the service. So again, the public trust issue that we just mentioned, the loss of trust in Mr. Reid in a security position, the disruptiveness, the access to children on base... But the access, I mean, he doesn't... He has no more access to children on base than he does sort of in the community at large, isn't that right? I mean, the notion of the access to children on base almost makes it seem like he'd have to live in an all-adult community with giant bars around the community, otherwise he necessarily has access to children. I mean, that just seems to go too far. Given his job description, I mean, this guy... I mean, isn't he standing in a network computer area, basically not having access partly to people and certainly not having access to children as part of his job? Well, as the testimony showed in the appendix in pages 57, 86, 87, supplemental appendix 7 through 9, the base has just security at the perimeters. There are children living in houses on the base. There is no additional security. And as the testimony showed, people cut through those all the time and the agency has had trouble keeping people out of there who aren't a part of the residential community. Again, the decision-maker considered this fact that they would have to implement new security measures to ensure that an accused child molester would not have access to those areas. And that was something that the agency wasn't prepared to do. It also looked at whether or not they could allow Mr. Reid... In previous cases like Engdahl and others, Graybill, Engdahl, it seems that the person's employment actually related him as part of his or her employment to come in direct contact with children. And this case seems pretty far removed from those. Well, in Engdahl, I mean, what we had was, if I'm remembering correctly, or was it... Engdahl was the electrician that actually went into residential homes with children to fix the electrical. Sure. That clearly requires part of his job to come in to homes and private homes directly with children. And this is different. There's also the Graybill case, another child molestation case, where the individual delivered things to local schools and lots of other places. But aren't you more concerned about somebody delivering stuff to school and going into someone's home fixing electrical than some guy that's in the back room fixing a network? Well, I am not in a position to really question the decision-maker here who is the one who is aware of how the base works, how things proceed in that facility, and to question his judgment with regard to whether or not that is an actual risk. You know, the board here considered the testimony. What did he actually say with regard to the level of risk? Could you point me to the testimony? The testimony with regard to access to children, there is testimony at Appendix Page 56-58, Supplemental Appendix 7-9. There is also testimony from Mr. Reed on Page 77 with regard to a Bring Kids to Work Day where he would present a piece of text. What page is that, Mr. Lester? Appendix Page 77. And I have no clue about testimony on Pages 86-87, but let me see what that is. Okay. I'm looking on 56 and 57, which you pointed us to first. I can't go quite as quickly as you do. Sorry. But it says, Are there children living here? Yes, within a half a mile or a quarter of a mile or a half a mile. But where exactly is the part that says that he was concerned for the safety of those children and that's why he made the decision he did it? It's on Pages 56-57. Where? 58. That would be talking about that we have Mr. Zola testifying about the fact that there are about 9,000 people working at Port Monmouth every day. There are children living in military quarters. There's a child services facility. Yeah, I got all that. That's just there are kids there. Where's the part where he says that he's concerned that this particular guy could cause a risk of hazard to those children? I think the problem is that the testimony is so much flimsier than it was in Erdahl with regard to these witnesses. There is also testimony, again, Your Honor, on Pages 7-9. Again, Your Honor, I would just reiterate that the Board actually heard this testimony. The Board made specific findings with regard to this issue on Page 8-12. Yeah, but if the testimony doesn't exist as you're representing it, then it's a real problem. I'm trying to find the place where somebody said they were concerned for the safety of the children. It's not enough just to say it seems to me that there happen to be children within about a mile of here even though as part of his job he has no contact with them. So I'm trying to find a place where that is said. It might be in your briefs, and I'll certainly review them. I don't want to hang you up with all your time. I would refer to Supplemental Pages 7-9, Your Honor. Mr. Lester, here we have a suspension without pay based on an indictment on a topic on which Mr. Reed was eventually found not guilty. The charges were dismissed, Your Honor. So for whatever reason, the charges were dismissed so that he was not guilty. And yet we have an immediate suspension without pay based on, admittedly, someone, the grand jury, must have found probable cause along the way, but it turns out that it was not sustained. That's correct. It seems, in view of all of the things that we're talking about, were there choices? There can be suspension with pay, without pay, administrative leave, There are all sorts of responses that might accommodate concerns. This is a conspicuous, this is an emotional kind of charge that gets an emotional response. But in the long run, having been exonerated, with the charges dismissed, doesn't it seem as if this was, plus all of the fact that no one knew about it, and saying, well, you should have told us. Had he announced it, he certainly would have been, whatever it is, said, go home and don't come back. Well, Your Honor, this court has spoken to whether or not back pay is mandated after an indefinite suspension for a crime for which the person, for which charges are dismissed. It talked about it in the Richardson case, in the Janowitz case, and found that in the circuit, back pay is not mandated. Now, you're correct, the agency can make various decisions, but the issue before this court is whether or not the fact of the subsequent acquittal or dismissal does not eradicate the validity of the concerns that were considered at the time of the indefinite suspension. But unless there's a matter of back pay, there's no controversy. Is there? He was exonerated or he's returned to work with perhaps some delay based on the security issues, which I gather from the briefs were resolved. So why are we here? Perhaps I can ask Mr. Broyden. Well, we're talking about a seven-month period where there was no back pay, just the period of the indefinite suspension. How much money is involved? Seven months of pay, Your Honor. I don't know what the specific amount is. Did the government consider settling this case? I mean, given the flimsy nature of the witness testimony, and I realize we give a lot of deference and discretion, but this is a far cry from Erdahl. Well, Your Honor, this is— Seven months of pay. You didn't consider settling? Well, Your Honor, this is the agency's decision as to how to pursue the matter at hand. I'm just asking a question of sort of fact. Were there settlement negotiations or anything? I cannot tell you, Your Honor. I do not know. I'm sorry. That's okay. All I can say is that based upon the totality of evidence, which the board here considered, and the totality of the factors and the findings that the decision-maker made, he certainly was within his discretion, as the board has affirmed, to find that, in fact, there was a nexus here between the misconduct and the efficiency of the service. You rely on—when it comes down to it, you rely, Mr. Lester, on the judgment of the government managers at the base, right? Well, and of the MSPB administrative judge who made factual findings in response to the evidence and testimony that was presented. But his findings are based upon—his findings are based on their testimony. That is correct. That is correct, Your Honor. For these reasons, we would ask the court to affirm the decision below. Thank you, Mr. Lester. Mr. Braden, you have some time. Mr. Braden, how much money is involved here? Your Honor, GS 14, step 6, roughly, call it $130,000, so it's 7 months, 7 twelfths times that. I don't have a calculator, but, you know, it's something. If you want me to answer your question as to settlement negotiations, I'm happy to do so. If you don't, then I won't. No, in theory, they're irrelevant, but I gather that the consequence of a reversal, that that is the consequence and the only outstanding issue, isn't that right? Yes, Your Honor, and there's more than salary involved. Of course, as government employees, they also have retirement contributions and health insurance contributions, so there's a little bit more than salary involved here. It would also be nice to have this off his record. It is a disciplinary action of the highest order. It's a permanent record. That won't take it off the record, will it? Yes, it will. If this is reversed, then the indefinite suspension goes away. Are there any negative consequences on his record? I mean, aside from the monetary issues, I mean, nobody would, I mean, is it held against Mr. Reed in, you know, promotion and this kind of stuff and his consideration for future positions and so forth that he was temporarily suspended when, well, indefinitely suspended when it's recognized that the circumstances were that it followed an indictment that was later dismissed. And I think in the government's brief, it suggests that, it comes out and says we, you know, clearly he was, you know, found to be no merit to the charges and so forth. Is there any permanent... I mean, how much, I mean, how much, I guess what I'm saying is how much stain is there from the suspension on the record under those circumstances? I would have to place myself in the position, for example, of an official who would look at several qualified candidates for promotion and have to decide among these people and say would I want to have somebody who's been indefinitely suspended for seven or eight months  It's a hard question to answer. I would say given a group of equally qualified people, an indefinite suspension might raise a question in my mind as a selecting official. Because the selecting official doesn't have all this background. He doesn't have the briefs. He doesn't have the board transcript. He doesn't have the communications from the state of New York. All the selecting official has is a personnel file and whatever information he can gain from the candidates if he interviews them. It's a very limited record. And an indefinite suspension is certainly something I would not want in my record if I were a federal employee. My time has almost expired. I leave you with this. One final sentence. Thank you. I recognize the importance of discretion and also deference to the exercise of discretion in the decisions of this court. Discretion still must be reasoned and based upon substantial evidence. And the substantial evidence here does not show any likelihood of harm to this agency for the entire period of the indefinite suspension or afterwards or before. The only result that occurred from affirming this, unfortunately, would be creating an irrebuttable presumption that an indictment on reasonably serious charges, and they're mostly going to be on reasonably serious charges, will sustain an indefinite suspension and make it impossible for the employee to avoid it through a board hearing. I think that would be a terrible result. That certainly was not the way the court approached that in Engdahl, and Engdahl was a far, far stronger case than this. Thank you, Your Honor. Thank you, Mr. Breda and Mr. Lester. The case is taken into submission.